NICOLE LaBONTE,

     Plaintiff,

  v.

ASCENSUS, LLC, and

PERSISTENT SYSTEMS LIMITED, USA BRANCH,

     Defendants.

Case No. _____



26-CV-1330

U.S. District Court
Wisconsin Eastern

AUG 03 2026

FILED
Clerk of Court

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Nicole LaBonte ("Plaintiff"), proceeding *pro se*, brings this action against Ascensus, LLC ("Ascensus") and Persistent Systems Limited, USA Branch ("Persistent Systems," or "Persistent") (together, "Defendants") and alleges as follows:

## PRELIMINARY STATEMENT

This is an action for employment discrimination and retaliation. Ascensus terminated Plaintiff because of her age, her association with family members who have disabilities, her family medical history, and her use of family leave to care for her sister with a disability, for whom she is a legal co-guardian. These protected characteristics together made her costly to Ascensus in two distinct ways. Because Ascensus self-funds its health plan, her age, her family's disabilities, and her family medical history increased the medical claims it pays from its own funds; and, separately, her intermittent family leave took her away from work from time to time. Plaintiff brings claims for this discrimination, for interference with her family leave, and for retaliation; for a declaratory judgment that she never signed and is not bound by either the Ascensus Severance Agreement or the Persistent Systems Employment Contract, and that the

Ascensus waivers are in any event void; and, under Wisconsin law, for the unauthorized use of her personal identifying information and for unpaid wages.

Plaintiff came to Ascensus through acquisition, with more than eight years of continuous service. On information and belief, the day after she told Human Resources that her husband had suffered a stroke and resulting disabilities, Ascensus quietly began the steps that would end her employment: without telling her, it moved her into its Annual Incentive Plan, which became the tool of her layoff and the means by which it withheld her earned bonus as leverage to pressure her to sign away her rights. It then carried out a mass layoff, concealing her individual selection within it. It laid off approximately 130 employees, offered approximately 110 of them a contract with Persistent Systems to return as contractors doing the same jobs, and split the severance money and the legal waivers between two documents from two separate companies so that neither met the legal requirements for a valid waiver. Plaintiff and the others who did not sign the Persistent Systems Employment Contract, a separate company's contract, were then misclassified as having "resigned" from Ascensus. That label contradicted Ascensus's own Severance Agreement, which described the separation as a termination and set a termination date. Plaintiff signed neither document and is bound by neither. She seeks to recover for the harm done to her.

## I. JURISDICTION AND VENUE

1. This Court has federal-question jurisdiction under 28 U.S.C. § 1331. Plaintiff sues under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f); the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; the Genetic Information Nondiscrimination

Act ("GINA"), 42 U.S.C. § 2000ff *et seq.*; and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*

2. The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's related Wisconsin-law claims for unauthorized use of her personal identifying information (Wis. Stat. § 895.446, predicated on Wis. Stat. § 943.201) and for unpaid wages (Wis. Stat. § 109.01 *et seq.*).

3. Venue is proper under 28 U.S.C. § 1391(b) because Plaintiff resides in, and worked remotely for Ascensus from her home in, Shawano County, Wisconsin, so that a substantial part of the events giving rise to her claims occurred in this district. Both Defendants directed the challenged conduct at Plaintiff in Wisconsin: Ascensus employed her remotely in Wisconsin and directed its decisions to her there, and Persistent Systems reached into Wisconsin by emailing her, at her Wisconsin home, the Persistent Systems Employment Contract — which bore her Wisconsin home address, set her work location as Shawano, Wisconsin, and carried the Wisconsin-earned severance it described as "provided by Ascensus." Each Defendant is therefore subject to this Court's personal jurisdiction.

4. Plaintiff exhausted her administrative remedies. The EEOC issued Notices of Right to Sue on both charges on May 11, 2026, each upon a finding of reasonable cause against the respective Defendant: Charge No. 26G-2025-00889, as to Ascensus (attached as Exhibit A), and Charge No. 26G-2025-01217, as to Persistent Systems (attached as Exhibit B). This Complaint is filed within ninety days. The facts alleged here were presented to and developed during the EEOC's investigation of these charges, including in Plaintiff's rebuttals to Defendants' position statements, and Plaintiff's federal discrimination and retaliation claims are within the scope of that investigation. Defendants' own arguments and defenses are likewise set out in their EEOC

position statements and are already part of the administrative record of these charges. Plaintiff's FMLA and Wisconsin-law claims require no exhaustion.

## II. PARTIES

**5.** Plaintiff resides in Shawano County, Wisconsin. She was 48 years old when laid off and remains within the ADEA-protected class. During her employment, her husband suffered a stroke leaving him with permanent disabilities; he had no other health insurance and was covered as a dependent on Plaintiff's Ascensus health plan. Plaintiff is also one of two legal co-guardians of a sister with a severe, lifelong intellectual and developmental disability, for whose care Plaintiff used Ascensus-approved intermittent FMLA leave.

**6.** Ascensus, LLC is headquartered in Dresher, Pennsylvania, and is one of the nation's largest recordkeepers and administrators of retirement and savings accounts, handling consumers' nonpublic personal financial information subject to the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6801 *et seq.* Ascensus was Plaintiff's employer from its April 7, 2022, acquisition of her prior employer until it terminated her on February 20, 2025, with continuous service dating to April 11, 2016. Ascensus was also the recordkeeper of Plaintiff's own 401(k) account, making Plaintiff both an employee and a customer of Ascensus.

**7.** Persistent Systems Limited, USA Branch is the U.S. branch of its parent, Persistent Systems Limited, headquartered in Pune, India, with a registered office in Santa Clara, California. It issued Plaintiff the Persistent Systems Employment Contract at issue and acted as a joint employer of Plaintiff and of the approximately 110 employees offered that contract.

Case 1:26-cv-01330-BBC    Filed 08/03/26    Page 4 of 23    Document 1

## III. THE AGREEMENTS

**8.** Three documents are central to this action. Plaintiff signed none of them.

**9.** The Annual Incentive Plan (the "AIP"), governed by Pennsylvania law, was not a standard bonus plan; as applied to Plaintiff it was the instrument Ascensus used to carry out her layoff. Plaintiff had already earned her AIP bonus for 2024. Under the plan, an award is payable the following second quarter, and an associate who leaves before payment forfeits it unless "actively employed on the date of payment," though Ascensus may grant exceptions. Because Plaintiff was being laid off months before that payout, she stood to forfeit her earned bonus, and Ascensus used its exception authority to offer it back only if she signed the Ascensus Severance Agreement. Human Resources marketed that agreement as merely a "bonus agreement," "just for your 2024 AIP payment," when it was in fact a broad waiver of legal claims.

**10.** The Ascensus Severance Agreement, governed by New York law, is Ascensus's own severance and claims-release document. It contained the waivers and releases of her legal claims and set her Employment Termination Date as February 20, 2025, but stated no dollar amounts; the severance figure was calculated by Ascensus and placed instead in the Persistent Contract below. Plaintiff never signed it, and it expired on its own terms.

**11.** The Persistent Systems Employment Contract (the "Persistent Contract"), governed by California law, is the contract Persistent offered as part of the employee-to-contractor conversion. It carried binding arbitration, jury-trial and class-action waivers, and a release of claims, and it was where Plaintiff's Ascensus severance appeared, described as "provided by Ascensus." To collect that severance, the contract required Plaintiff to work an Ascensus project as a Persistent employee for roughly seven months, then decline further work so Persistent would terminate her, at which point she would finally become "eligible" for the severance Ascensus already owed her. Plaintiff never accepted or signed it, and it expired on its own terms.

## IV. BACKGROUND FACTS

**12.** Many of the facts below are established by Defendants' own words: their administrative position statements, the personnel and separation records Ascensus produced to Plaintiff, and the Persistent Contract and related documents. Ascensus submitted position statements to both the Wisconsin Equal Rights Division and the EEOC, and Persistent Systems to the EEOC. Plaintiff's dual-filed charges were transferred to the EEOC for full investigation, and its investigator required Plaintiff to rebut the Ascensus ERD statement as part of that investigation.

**13.** Plaintiff worked continuously from April 11, 2016 — first for PAi, then for Newport Group after it acquired PAi, and then for Ascensus after it acquired Newport Group on April 7, 2022 — accruing more than eight years of service. She received strong performance reviews and merit raises, and Ascensus had hoped she would keep performing the very same work as a contractor after her layoff.

**14.** Ascensus self-funds its health plan, paying every employee and dependent medical claim from its own funds, so an employee whose family has a serious illness is a direct and continuing expense to Ascensus. Ascensus admitted in its EEOC position statement that the layoff was "primarily driven by the Company's financial needs." Plaintiff fit the costly profile: older, the sole coverage on that plan for a husband with a permanent disability, and a legal co-guardian who used intermittent FMLA leave for her sister. Her manager told her the selection was not performance-based, and her team leader said he had no input in it.

**15.** That stated "financial need" is contradicted by Ascensus's own conduct. In a late-2024 company-wide email it touted its "growth" and "strong financial results," and paid an automatic company-wide bonus that December to its associates, excluding those it had moved into the AIP. It was also hiring, not shrinking: it posted Information Technology openings before, during, and after the layoff, and brought a new developer onto Plaintiff's own team during her layoff.

Case 1:26-cv-01330-BBC        Filed 08/03/26        Page 6 of 23        Document 1

**16.** The layoff targeted specific employees, not the company's finances. Ascensus first moved Plaintiff and the other selected employees into the AIP, then excluded them from the company-wide bonus it paid everyone else. The "financial needs" it invoked were the targeted costs of specific, costly employees, not the company's own solvency.

**17.** On April 11, 2024, Plaintiff disclosed her husband's severe stroke to Human Resources in a Workday benefits case, in enough detail that Human Resources understood its severity and continuing cost. The next day, April 12, 2024, Ascensus triggered an unexplained, off-cycle salary change in her Workday record, effective May 25, 2024. On information and belief, it enrolled her in the AIP at the same time, effective that same date, which indicates the two were set in motion together. After Plaintiff acknowledged that enrollment months later, Ascensus backdated the AIP's effective date, gave her no notice of the change, and left no audit trail in the records disclosed to her. She first learned of the concealed enrollment, the altered date, and her selection for the employee-to-contractor conversion only when she received her personnel records at her layoff.

**18.** Ascensus carried out the layoff through a two-company structure. By its own position statements, it laid off approximately 130 employees and offered approximately 110 of them the Persistent Contract, under which they would become Persistent's employees and return to Ascensus as contractors doing the same jobs. Ascensus announced the layoff on February 12, 2025, required the Persistent Contract signed by February 19, and set termination for February 20, 2025. It terminated the affected employees on February 20, and the Persistent Contract itself did not begin until February 21. No employee moved to Persistent without first being laid off.

**19.** Ascensus and Persistent Systems operated this conversion together, Ascensus designing and directing it and Persistent Systems executing it, and both directed the challenged conduct at

Plaintiff. On these facts they acted as joint employers and joint participants. The structure let Ascensus avoid recording a layoff no matter what an employee did. Whether an employee accepted Persistent's offer, declined it, or signed nothing at all, Ascensus recorded a "voluntary" departure rather than a layoff, solely because Persistent existed. Ascensus admits as much in its own words: its EEOC position statement states that "any Ascensus employee, including Claimant, who rejected the offer to transfer to Persistent was considered to have voluntarily resigned from Ascensus." That an employee was "considered to have" resigned confirms Ascensus assigned the label; the employee did not choose it. Ascensus thus fixed each employee's status by reference to the Persistent arrangement, an interrelation of operations that is a hallmark of joint employment. In Plaintiff's case, it marked her resigned solely because she did not sign with Persistent, though she took no affirmative step of any kind. She had in fact asked to remain an Ascensus employee, whether through her project's completion or in another role, and Ascensus refused. She was given no option to stay. Plaintiff asserts her claims against each Defendant both individually and as joint employers, and reserves that election as set out in the Reservation of Rights below (Section V).

20. Plaintiff signed neither the Ascensus Severance Agreement nor the Persistent Contract, and neither ever bound her. Her Persistent offer expired on February 19, 2025, and the Ascensus Severance Agreement, which allowed at least 21 days to sign, likewise expired unsigned. Plaintiff took no affirmative step to end her employment; the offers simply lapsed, and Ascensus terminated her on February 20, 2025. Ascensus, not Plaintiff, made the final decision. It then misclassified the employees who had not signed, including Plaintiff, as having "voluntarily resigned," though it had announced a layoff, its own Severance Agreement set her Employment

Case 1:26-cv-01330-BBC     Filed 08/03/26     Page 8 of 23     Document 1

Termination Date as February 20, and the Wisconsin Department of Workforce Development later determined she was laid off and approved her unemployment benefits.

**21.** As a result, Plaintiff lost the severance Ascensus set and owed ($40,372) and the 2024 company-wide bonus (an estimated $2,265); her benefits and her family's coverage ended; and a false "resignation" now sits on her employment record. Although her termination also caused lost earnings, Plaintiff does not seek back pay or front pay in this action; the wages she claims are the withheld, already-earned amounts identified above — the severance and the bonus. She also suffered the unauthorized disclosure of her private personal information and emotional distress. The facts specific to each claim are set out in the counts below.

## V. RESERVATION OF RIGHTS

**22.** Each count is pleaded independently and, where applicable, in the alternative under Federal Rule of Civil Procedure 8(d). No count depends on the success of any other, and the failure of any single allegation, theory, or count does not defeat the remaining claims.

**23.** Plaintiff seeks relief against each Defendant both jointly and individually. The joint-employer allegation is one basis for liability, not the only one. A determination that Defendants are not joint employers, or that one Defendant is not liable on a claim, does not defeat Plaintiff's claims against the other; each remains separately answerable for its own conduct directed at Plaintiff.

**24.** Plaintiff has named Persistent Systems Limited, USA Branch, which appears on the footer of the Persistent Contract and is the entity named in Plaintiff's EEOC charge, on which the EEOC found reasonable cause. Because the Persistent Systems name has been used inconsistently across the documents, and affiliated, parent, or successor entities may also have

Case 1:26-cv-01330-BBC    Filed 08/03/26    Page 9 of 23    Document 1

participated, Plaintiff reserves the right to amend to add such entities and individuals if discovery reveals that others were involved.

## COUNT I — AGE DISCRIMINATION (ADEA)
*29 U.S.C. § 621 et seq. — Against All Defendants*

**25.** Plaintiff incorporates the preceding paragraphs. She was over 40, qualified for her position, and suffered an adverse employment action. Age was a but-for cause of her selection, whether relied on directly or as a deliberate proxy for cost, since older workers are systematically more expensive under Ascensus's self-funded plan. Pretext is shown in at least three ways: Ascensus's own contradictory descriptions of the event; its refusal to produce the age and selection data the law required it to disclose; and the age trend in the limited layoff data Plaintiff could observe.

**26.** First, Ascensus has described the same event in mutually contradictory terms, both across and within its own position statements. Its EEOC position statement labels the event a reorganization, a job elimination, a termination, a separation, a voluntary resignation, and a transfer to a third party. Its earlier ERD position statement contradicts itself on the central question, stating in a single passage that Plaintiff was "not terminated" yet that her employment "was voluntarily terminated," and that she both "voluntarily resigned" and belonged to a group whose "positions with Ascensus were eliminated." Such shifting, self-contradictory explanations are evidence of pretext.

**27.** Second, Ascensus withheld the ages, job titles, and selection criteria the OWBPA required it to disclose for a group layoff, 29 U.S.C. § 626(f)(1)(H), and that Plaintiff separately requested under Wisconsin's personnel-records law, Wis. Stat. § 103.13. Ascensus's Human Resources ignored her repeated requests and, after she cited that Wisconsin statute, told her she was "not entitled to anything else," refusing to produce the selection records Wisconsin law

Case 1:26-cv-01330-BBC    Filed 08/03/26    Page 10 of 23    Document 1

entitled her to inspect. That withholding supports an adverse inference that the withheld criteria would show age influenced the selection. Ascensus's failure to follow any of the OWBPA's release requirements, detailed in Count V, reinforces that inference, because those requirements exist precisely to let older workers detect an age-based pattern.

**28.** Third, Plaintiff's own analysis of the limited data available to her points the same way. Ascensus split the affected employees into multiple separate follow-up layoff meetings on February 13, 2025, and withheld the full layoff data, so the only group Plaintiff could observe was the IT employees in her own meeting, together with Human Resources and management. Of the roughly sixty IT employees she counted there, approximately 71% held senior-level roles, which in information technology trend older.

## COUNT II — ASSOCIATIONAL DISABILITY DISCRIMINATION (ADA)
*42 U.S.C. § 12112(b)(4) — Against All Defendants*

**29.** Plaintiff incorporates the preceding paragraphs. The ADA prohibits discrimination against an employee because of a known association with a person who has a disability. Plaintiff has two: her husband, whose severe stroke left him with permanent disabilities, and her sister, who has an intellectual and developmental disability. Both are disabilities under the ADA. Ascensus knew of both directly from Plaintiff: through her April 11, 2024, Workday disclosure of her husband's stroke, her logging of FMLA leave for her sister, and her communications with her manager. This is an "expense"-type associational claim. Her husband was covered under Ascensus's self-funded plan, so the substantial medical costs of his stroke and rehabilitation fell on Ascensus during the very period it was selecting her, and her sister's care required intermittent FMLA leave that added to the cost of retaining Plaintiff. Her known association with each was a motivating factor in her termination. Plaintiff suffered the damages described above.

Case 1:26-cv-01330-BBC    Filed 08/03/26    Page 11 of 23    Document 1

## COUNT III — FAMILY MEDICAL HISTORY DISCRIMINATION (GINA)

*42 U.S.C. § 2000ff et seq. — Against All Defendants*

**30.** Plaintiff incorporates the preceding paragraphs. GINA prohibits discrimination based on genetic information, which includes "the manifestation of a disease or disorder in family members." 42 U.S.C. § 2000ff(4)(A)(iii). Her husband's stroke and her sister's intellectual and developmental disability are that manifestation, and thus Plaintiff's family medical history. Ascensus learned of both directly from Plaintiff, through her Workday disclosures and her communications with her manager, and used that family medical history as a factor in selecting her for termination. Its motive was cost: the family history signaled ongoing expense, her husband's stroke care falling on Ascensus's self-funded plan and her sister's condition requiring recurring protected leave. Ascensus used it to shed those predicted costs, admitting the layoff was "primarily driven by the Company's financial needs." Plaintiff suffered the damages described above.

## COUNT IV — DECLARATORY JUDGMENT: INVALIDITY OF WAIVERS

*Declaratory Judgment Act, 28 U.S.C. § 2201 (fraud and economic duress) — Against All Defendants*

**31.** Plaintiff incorporates the preceding paragraphs. Plaintiff does not sue to enforce either the Ascensus Severance Agreement or the Persistent Contract, and an actual controversy exists over whether their terms bind her. She signed neither, both offers expired on their own terms unaccepted, and she is bound by none of them, for the reasons that follow.

**32.** As to the Ascensus Severance Agreement: Plaintiff never signed it. She submitted a Workday request for copies of all documents she had signed, and Ascensus produced none — confirming, in a March 20, 2025, email, that she had no "signed confidentiality agreement on file." No signed Severance Agreement exists, yet Ascensus relied on the Severance Agreement

Case 1:26-cv-01330-BBC    Filed 08/03/26    Page 12 of 23    Document 1

in its EEOC position statement. Its release, waiver, and gag terms do not bind Plaintiff, who never signed it.

33. Plaintiff never accepted or signed the Persistent Contract. Persistent's own EEOC position statement admits that Plaintiff "did not accept the offer." The binding arbitration, jury-trial and class-action waiver, and full release of claims appear only in that unaccepted offer. Because Plaintiff never accepted the contract, none of its terms can bind her, and no party may invoke them against her.

34. Neither Defendant may use the other's agreement against Plaintiff. In a March 10, 2025, email from Human Resources, Ascensus treated Plaintiff's not signing the offer from Persistent, a separate company, as its stated reason to keep her separation a "voluntary resignation." Its own position statement calls the separation "her termination," asserting only that "rejection of the employment offer with Persistent would render her termination voluntary." But declining a separate company's contract is not a resignation from one's own employer, and neither company's document can govern Plaintiff's status with the other. The timeline defeats the theory on its own. The Persistent offer expired by its own terms on February 19, 2025, and Ascensus terminated Plaintiff the next day, February 20. No Persistent offer was even open when Ascensus ended her employment.

35. In the alternative, as Federal Rule of Civil Procedure 8(d) permits, to the extent any waiver in the Ascensus Severance Agreement is deemed to bind Plaintiff, it is void, because it was procured by both fraud and economic duress. The fraud lay in how Ascensus presented that Severance Agreement. It placed the severance dollars only in the Persistent Contract and the legal waivers only in the Severance Agreement, which contained no monetary amounts, and its Human Resources told employees the Severance Agreement was "just for your 2024 AIP

payment" and a "bonus agreement," when it was in fact a broad release requiring them to "waive any rights to sue." Ascensus's own EEOC position statement confirms the design, admitting: "To process that bonus, the employees needed to sign a separation agreement," and so conceding the earned bonus was conditioned on signing the release.

36. The duress lay in how Ascensus forced the choice. It withheld Plaintiff's earned 2024 bonus and made signing the Ascensus Severance Agreement the condition of paying it. Her earned severance appeared only in the Persistent Contract, which carried a four-business-day deadline over a weekend and a federal holiday, so the real window to secure her money was days, not the 21 the Severance Agreement nominally allowed. Ascensus also cut off her benefits the day after her termination, on only a few business days' notice. Throughout, Plaintiff was pressured from both sides: a Director, a Vice President, and a Senior Vice President at Ascensus pushed Plaintiff to sign the Persistent Contract, Persistent scheduled meetings and sent emails, and when Plaintiff asked Ascensus about her severance, Ascensus shut her questions down and redirected her to Persistent, even though the Persistent Contract stated the severance was "provided by Ascensus." Plaintiff also had no legal help she could turn to, because the prepaid LegalShield benefit Ascensus provided excluded any dispute "related to the Member's employment." Taken together, these conditions left Plaintiff no reasonable alternative, the hallmark of duress. Plaintiff seeks a declaration that she is bound by none of these terms.

## COUNT V — DECLARATORY JUDGMENT: THE ADEA WAIVER IS VOID UNDER THE OWBPA
*29 U.S.C. § 626(f) — Against All Defendants*

37. Plaintiff incorporates the preceding paragraphs. The Ascensus Severance Agreement purported to release Plaintiff's claims, including under the ADEA. Such a waiver is valid only if it is knowing and voluntary and satisfies the specific requirements of the OWBPA, 29 U.S.C. §

626(f)(1); the burden of proving those requirements were met rests on Defendants, 29 U.S.C. § 626(f)(3). An actual controversy exists because Ascensus has relied on that agreement against Plaintiff. She never signed it; but to the extent any ADEA waiver in it is asserted to bind her, it is void.

**38.** The release was offered as part of a group termination program. Ascensus's own EEOC position statement describes it as "the separation agreement offered to 130 others." That triggered the OWBPA's group requirements, and the agreement satisfied none of them. First, the OWBPA required at least 45 days to consider a group-program release, 29 U.S.C. § 626(f)(1)(F)(ii); the Ascensus agreement allowed 21 and stated no dollar amount, while the only document bearing the severance figure, the Persistent Contract, carried a four-business-day deadline. Second, it required written disclosure of the decisional unit and of the ages and job titles of those selected and not selected, 29 U.S.C. § 626(f)(1)(H); Ascensus disclosed none. Third, it required the release to refer specifically to ADEA rights and to be written to be understood, 29 U.S.C. § 626(f)(1)(B); Human Resources instead presented it as a "bonus agreement." Fourth, it required consideration beyond what the employee was already owed, 29 U.S.C. § 626(f)(1)(D); Ascensus offered Plaintiff only her own already-earned severance and did not even state the amount. Plaintiff was thus asked to release her claims for no new consideration and without knowing what she would receive.

**39.** Plaintiff seeks a declaration that any waiver of her ADEA rights in the Ascensus Severance Agreement is void and unenforceable under the OWBPA — a burden of validity that, under 29 U.S.C. § 626(f)(3), rests on Defendants and that they cannot carry.

## COUNT VI — FMLA INTERFERENCE AND RETALIATION
*29 U.S.C. § 2601 et seq. — Against All Defendants*

**40.** Plaintiff incorporates the preceding paragraphs. Plaintiff took Ascensus-approved intermittent FMLA leave to care for her adult sister with a disability. Ascensus's approval of that leave as FMLA-qualifying resolves the only close question here: although the FMLA does not ordinarily cover care for a sibling, it does where the employee stands in loco parentis to an adult with a disability who is incapable of self-care — as Plaintiff does, as her sister's legal co-guardian. Ascensus knew of that leave. Plaintiff's recurring intermittent absences, sometimes on short notice for urgent matters, carried a productivity and scheduling cost — lost work time, and the burden of planning around leave that could arise unpredictably — that made her more expensive to retain and contributed to her selection for termination, alongside her age, her association with family members who have disabilities, and her family medical history. Making protected leave a negative factor in an employment decision, even one factor among several, violates the FMLA and 29 C.F.R. § 825.220(c). Plaintiff suffered the damages described above.

## COUNT VII — RETALIATION
*ADEA, ADA, GINA, and FMLA — Against All Defendants*

**41.** Plaintiff incorporates the preceding paragraphs. Plaintiff's protected activity was refusing to sign a release she reasonably and in good faith believed was coercive and unlawful, in order to preserve the discrimination claims she now brings. She took no affirmative step to end her employment; the offers simply expired, and the decision to terminate her was Ascensus's alone. Ascensus retaliated in several ways: it withheld her earned severance, it withheld her earned 2024 bonus, it misclassified her employment status as a "voluntary resignation" though she signed no resignation and submitted no resignation letter, and it has used that false classification to try to defeat her claims under the discrimination laws. Ascensus admitted the causal link in its

own March 10, 2025, email: "You were offered a position by Persistent which you chose not to accept, so your separation from Ascensus will correctly remain as a voluntary resignation." The close timing and Ascensus's written admissions establish the causal connection. Plaintiff suffered the damages described above.

**42.** That false "resignation" is central to Defendants' defense. On the theory that a voluntary departure may not be considered an adverse action, the misclassification is Defendants' attempt to defeat Plaintiff's discrimination and retaliation claims. The label first appeared in an automated "Departing Ascensus" email sent at the end of Plaintiff's last day. That email stated that its information was provided "as a result of your resignation, effective 02/20/2025," and it referred to a "resignation notice period," though Plaintiff gave no notice and submitted no resignation. It stated no reason and did not mention Persistent. Plaintiff contested the label immediately, in Workday and to her manager. She stated that she had not resigned and had been laid off, and she explained the layoff process to Human Resources. Ascensus did not articulate its "declined Persistent" rationale until weeks later. Defendants advanced the voluntary-departure argument in both of their EEOC position statements, with Ascensus invoking the "resignation" repeatedly as the recurring premise of its statement. Plaintiff contested the misclassification each time, and the Wisconsin Department of Workforce Development, which determined she was laid off, has already rejected it. Defendants' continued maintenance of that false classification is itself retaliation: each time they reassert the "resignation" to oppose Plaintiff's exercise of her protected rights, they commit a further, discrete act of retaliation.

## COUNT VIII — UNAUTHORIZED USE OF PERSONAL IDENTIFYING INFORMATION

*Wis. Stat. § 895.446 (predicated on Wis. Stat. § 943.201) — Against All Defendants*

**43.** Plaintiff incorporates the preceding paragraphs. Wis. Stat. § 895.446 gives a person who suffers loss from conduct prohibited by Wis. Stat. § 943.201 a civil action for actual damages, costs, and exemplary damages up to three times actual damages. The prohibited conduct is intentionally using another person's personal identifying information, without consent and by representing authorization, to obtain a benefit or to harm the reputation, property, person, or estate of another. To carry out the conversion, Ascensus disclosed to Persistent, and Persistent used, Plaintiff's identifying information, including her name, home address, salary, job role, and severance figure, without her consent. The Persistent Contract's statement that her severance was "provided by Ascensus" is documentary proof of that disclosure and use. Whether Ascensus disclosed more, and whether any of it reached Persistent's India-based parent, is within Defendants' knowledge and can be established only through discovery.

**44.** Ascensus was also the recordkeeper of Plaintiff's own 401(k), making her its customer under the Gramm-Leach-Bliley Act and her data the nonpublic personal information a financial institution must protect. Under 15 U.S.C. § 6801(a), every financial institution has "an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." That Plaintiff's data reached Ascensus as employment records does not change that duty. The GLBA required Ascensus to give notice and an opt-out before disclosing that information to a nonaffiliated third party, and to safeguard it. Ascensus did neither, yet disclosed her data to Persistent, on information and belief without adequate security. The same conversion exposed the data of roughly 110 employees, many of them, like Plaintiff, Ascensus's own 401(k) customers, showing systemic disregard. Plaintiff does not sue under the GLBA, which affords no private

right of action; she cites it only to show the disclosure was unauthorized and reckless. Defendants used that information for both prohibited purposes.

**45.** First, Defendants used Plaintiff's information to harm her. The employee-to-contractor conversion could not have been carried out without her information; it was the very instrument that made her injury possible. Her information was the means by which Defendants stripped her of her employee status, recast her as a contractor-offeree who had "resigned," withheld her earned severance and bonus, and exposed her personal and financial data. That harm flowed by reason of that unauthorized use. To the extent wage loss is recovered here, Plaintiff seeks it once, as actual damages trebled under Wis. Stat. § 895.446 or as wages under Wis. Stat. § 109, electing the greater and not recovering twice.

**46.** Second, Defendants used Plaintiff's information to obtain a benefit, which the statute reaches whether or not the benefit is fully obtained. They used her identifying and salary information to generate the Persistent Contract, embed her severance, and build the split-document structure designed to convert her to a contractor, shed the costs of her employment while keeping her labor, and conceal that her selection rested on discriminatory, cost-based criteria by recasting it as a voluntary conversion. That she never accepted the arrangement does not excuse the conduct. This use is what the statute prohibits.

## COUNT IX — UNPAID WAGES (WISCONSIN WAGE PAYMENT AND COLLECTION LAW)
*Wis. Stat. § 109.01 et seq. — Against All Defendants*

**47.** Plaintiff incorporates the preceding paragraphs. Under Wis. Stat. § 109.01(3), "wages" include severance or dismissal pay and bonuses. Ascensus withheld two categories of Plaintiff's earned wages: her severance and the 2024 company-wide bonus.

**48.** Ascensus calculated Plaintiff's severance at $40,372 under its standard protocols for her full length of service. Two documents independently confirm that amount and Ascensus's obligation to pay it: its Human Resources confirmed calculating it in Plaintiff's Workday severance case, and the Persistent Contract states that exact figure as a sum "provided by Ascensus."

**49.** Persistent Systems was the gatekeeper to that severance. Plaintiff's earned severance was set out in the Persistent Contract and paid only to employees who signed it. Severance is wages under Wisconsin law regardless of the contract's terms. Because Persistent's contract was the vehicle through which those wages were conditioned and withheld, Plaintiff asserts this count against both Defendants as joint employers and joint participants.

**50.** Plaintiff was excluded from the 2024 company-wide bonus, paid to other associates, only because Ascensus unilaterally moved her into the AIP and then, by email, declared her ineligible on that basis — an exclusion the AIP plan itself nowhere requires. That company-wide bonus, a Special Recognition Payment, is calculated under Ascensus's own terms as two percent of eligible earnings, subject to a $1,000 minimum and a $3,000 maximum; based on Plaintiff's Ascensus base salary of $113,233.30, her payment would have been an estimated $2,265 (two percent, within the plan's $3,000 cap).

**51.** Plaintiff is entitled to those wages, together with increased wages, costs, and expenses under Wis. Stat. §§ 109.03 and 109.11. Because Defendants withheld these same wages through the unauthorized use of Plaintiff's personal identifying information alleged in Count VIII, the withheld amount is also the actual damages there, which Wis. Stat. § 895.446 permits to be trebled as exemplary damages. Plaintiff seeks the greater of the remedies available on these wages and does not seek double recovery of the same loss. She also discloses that she filed a

wage claim on these same wages with the Wisconsin Department of Workforce Development, which remains unadjudicated.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Declare that Defendants violated the ADEA, the OWBPA, the ADA, GINA, and/or the FMLA; unlawfully used Plaintiff's personal identifying information under Wis. Stat. § 943.201 (actionable under § 895.446); unlawfully withheld Plaintiff's wages under Wis. Stat. § 109; and/or unlawfully retaliated against Plaintiff;

2. Declare that the waiver, release, arbitration, jury-trial, class-action, and gag terms in the Ascensus Severance Agreement and the Persistent Contract do not bind Plaintiff, who signed neither, and that the Ascensus waivers are in any event void under 29 U.S.C. § 626(f) and for fraud and economic duress;

3. Order Ascensus to correct Plaintiff's employment records to reflect a layoff, consistent with the Wisconsin Department of Workforce Development's unemployment determination that she was laid off;

4. Order Ascensus to produce the records bearing on Plaintiff's selection: the ages, job titles, and selection criteria for those selected and not selected in the group layoff, as the OWBPA requires, 29 U.S.C. § 626(f)(1)(H), and the personnel documents used in determining her termination, which Wisconsin law entitles her to inspect, Wis. Stat. § 103.13;

5. Order Defendants to provide a full accounting of Plaintiff's personal information, identifying what data was disclosed to or used by Persistent Systems and any affiliated, parent, or foreign entity, and to return or delete it and certify deletion;

**6.** Award all earned compensation wrongfully withheld — the $40,372 severance and the estimated $2,265 company-wide bonus detailed in Count IX — together with increased wages, costs, and expenses under Wis. Stat. §§ 109.03 and 109.11 on Plaintiff's Wisconsin wage claim; or, as the greater remedy, those same withheld amounts as actual damages trebled up to three times under Wis. Stat. § 895.446 (Count VIII), Plaintiff electing whichever is greater and not seeking double recovery of the same loss;

**7.** Award compensatory damages for emotional distress; liquidated damages under the ADEA, 29 U.S.C. § 626(b); punitive damages; and exemplary damages up to three times actual damages under Wis. Stat. § 895.446;

**8.** Hold Defendants jointly and severally liable for all monetary relief awarded on any claim as to which both are found liable;

**9.** Award Plaintiff the costs of this action and her reasonable litigation expenses, including the filing fee, service fees, and printing, postage, and travel expenses (including travel to the courthouse if electronic filing is not permitted), and reasonable attorney's fees to the extent she pays for limited-scope legal assistance or becomes represented, under the fee-shifting provisions of the statutes sued upon, including the ADEA (29 U.S.C. § 216(b)), the ADA (42 U.S.C. § 12205), GINA (42 U.S.C. § 2000ff-6), and the FMLA (29 U.S.C. § 2617(a)(3)); and

**10.** Grant such other and further relief as the Court deems just and proper, including any additional or amended relief warranted by facts revealed in discovery — such as the full scope of Defendants' acquisition, disclosure, and use of Plaintiff's personal information — and permit Plaintiff to amend her pleadings and requested relief to conform to the evidence.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct, except as to matters

alleged on information and belief, which I believe to be true.

Respectfully submitted,

**Nicole LaBonte, Plaintiff,** *pro se*
N7051 E. Lake Crest Drive
Shawano, WI 54166
414-209-4751
LatteBooks@proton.me

Dated: 8/3 , 2026